UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

------------------------------------------------------------------------X
BULLSEYEBORE, INC.

            Plaintiff,

  -against-

LANDBASE TRADING CO. LTD, et. al.

           Defendants.
------------------------------------------------------------------------X

Civil Action No.:
1:24-cv-00246-RDB

## DECLARATION OF YIFEN CHEN

I, YiFen Chen, declares as follows:

1. My name is YiFen Chen, I am the Chief Marketing Officer ("CMO") of Elay E-commerce Co., Limited (the "Company"). The Company is responsible for the PayPal Account: Elayecom@outlook.com, and maintains the domain name: certainow.com (the "Domain Name").

2. I have worked as the CMO for the Company for 3 years, and am familiar with many different aspects and dimensions of the company including with respect to marketing, procurement, revenue, and profits of products generally, and the products that are at issue in this case.

**NATURE OF THE COMPANY**

3. Elay E-commerce Co., Limited is an e-commerce company that engages in the sales of various miscellaneous products to interested buyers around the world.

4. Company was founded in January 2021. It is headquartered in Hong Kong SAR. We have no offices, employees, sales representatives, or real property in Maryland. We have no

registered agents in Maryland, are not registered to do business in Maryland, have no bank accounts in Maryland and have never filed any Maryland tax returns.

5. The Company sells approximately 1,000 different products.

6. The Company sells these products through certainow.com.

7. The Company has an Operations Team which is in charge of determining what products or items the Company should sell. The Operations Team's job is to follow rival e-commerce websites and examine the products that are sold or that seem popular.

8. If they identify any products which look promising, they would notify our company's outsourcing service provider. The outsourcing service provider for the Company is Wuhan Gufengda Network Technology Co., Ltd.

9. The outsourcing service provider undertakes a series of service outsourcing, including product procurement, warehousing, arranging personnel for packing, shipping, etc. Therefore, our Company does not directly purchase or store products itself.

10. I believe our Operations Team first identified these products as a popular item because we saw a lot of different e-commerce companies selling them. Because they were available on multiple platforms, we did not think that it would be an issue to also sell the same products as it did not seem any one company had exclusive rights.

### SALES OF ALIGNDRILL PRO PRODUCTS

11. According to our records, the Company began listing "AlignDrill Pro" on January 12, 2024, and has occurred 0 sales globally.

12. We have had 0 sales in the State of Maryland.

13. We have **never** sold any products under the name "Bullseyebore," nor were we aware of the company Bullseyebore or their products.

14. The Operations Team, who accessed the backend data system of the website, performed thorough searches using the plaintiff company's name, specific brand keywords, and broader category-related terms such as "AlignDrill Pro" "Align," and "Drill." They manually reviewed the search results against images of the allegedly infringing products, pinpointing matches by their appearance or use of similar brand keywords. Each product identified was linked to a unique website address and compiled into a list of landing pages. These addresses facilitated precise backend searches to comprehensively track all allegedly infringing orders if any.

15. According to the thorough searches, the total sales of "AlignDrill Pro" products in the United States was $0, and in Maryland was $0.

16. We have checked the searches thoroughly and can confirm that the searches result is accurate.

17. Based on this, the gross profits derived from the sale of the allegedly infringing products was $-29.64.

18. To our knowledge, the goods that we listed and advertised were under the mark: "AlignDrill Pro." Prospective customers would see the products listed on the Domain Name under the name AlignDrill Pro which is prominently visible. The words "Bullseyebore" do not appear anywhere in the product description.

19. We have never purchased any products from Bullseyebore, and to our knowledge, it is still not possible to purchase any products because we have been informed by our attorneys

that Bullseyebore does not have any final products available for sale. Therefore we cannot compare any the AlignDrill Pro products with the Bullseyebore products to see if they are the same or different or if the quality is better or worse.

## ADVERTISING AND MARKETING

20. The Company advertises and has advertised allegedly infringing products on Facebook.

21. We were able to obtain from the Meta/Facebook Ad Manager certain detailed records for the products and advertising.

22. When advertising on Facebook, we do not target any specific states or cities. We in fact include all countries in our advertising campaign because we offer international shipping and as a result we have a fair number of global sales on our products generally.

23. We only advertise our products through the Meta Ad Manager. We do not advertise on Tik-Tok, Pintrest, X (or Twitter).

24. According to our records, the total amount of money that was spent on Facebook Ad-Managers for advertising for the AlignDril products was $29.64. This amount should be further deducted from the revenues generated as a cost associated with generating the revenue.

## NO CONTINUED HARM TO PLAINTIFF

25. Since we first discovered the lawsuit, when this Court issued the initial temporary restraining order, we have permanently discontinued the sale of all AlignDrill Pro products on our website.

26. We have had no sales since that took place.

27. We have permanently removed all AlignDrill Pro products and advertising from our

domain names. We no longer have any advertisements of AlignDrill Pro products.

28. At the present moment, we have 0 remaining units of the allegedly infringing products contained in a warehouse. The warehouse is owned by the Wuhan Gufengda Network Technology Co., Ltd.

29. There is no ongoing harm to Plaintiffs. We have voluntarily but permanently discontinued all sales of "AlignDrill Pro products" products and will not resume sales irrespective of the outcome of this case.

## HARM TO THE COMPANY FROM ASSET RESTRAINT

30. When a TRO was first issued in this case, all of the money in our Company's PayPal account was frozen. This resulted in a total asset freeze of $454,830.46.

31. As a company that sells thousands of products, the sales from AlignDrill Pro products represents only a tiny fraction of our overall sales.

32. The asset restraint has had a major serious impact on our company's finances, affecting our working capital. The Company had to borrow funds to maintain operations, but borrowing funds incurs costs. The Company is forced to bear the interest on the loans, which is an additional expense. Even with borrowed funds, it is impossible to pay for the purchase of new goods, causing very tight cash flow. Currently, operations are barely maintained, and there is a possibility that the Company may not be able to operate normally in the future.

33. Because of this asset restraint, we have not been able to use those funds to acquire and offer additional products for sale, or invest in Facebook advertising campaigns for our other products, or to use those funds in any other aspects of our business. These are just a few of the many ways that the money in the account could have been used by the Company.

34. The harm that our company has incurred has been significant.

35. One simple way to measure the harm is that the money as frozen in PayPal does not collect any interest. From the time of the initial freeze January 2024 to present, the money would have accrued 8 months of interest which at 9% would have come out to $27,289.8.

36. For these reasons, we ask that the Court, to the extent that it issues any injunction at all, takes into account the documents and numbers produced, issues a properly tailored injunction, and also award to our Company a portion of the bond for damages sustained because of Plaintiffs' overreaching.

## RETAINING COUNSEL FOR REPRESENTATION

37. Our firm hired DGW Kramer LLP to represent us in this matter. This is a law firm that has a good reputation, is known to us, has staff that understands, speaks, and reads Mandarin/Chinese, and is familiar with our company and our practices.

38. They have previously represented us in this and other cases. We have never operated in Maryland and are unfamiliar with the attorneys there and have no relationship with any attorneys in Maryland.

39. After the Court indicated that only attorneys who are licensed to practice in the Maryland Federal Court may represent them, it is our understanding that our counsel proceeded to obtain admission to the Maryland Federal Court. Now that they have become admitted, we are now once again represented by attorneys who can now speak on our behalf.

## MISCELLANEOUS

40. This declaration was translated to me into Mandarin.

41. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Case 1:24-cv-00246-RDB   Document 106-5   Filed 11/25/24   Page 7 of 8

Dated:   September 20, 2024

By: ___*YiFen Chen*___
      YiFen Chen